v. Pactiv Corporation at all. My name is Richard Wolfram, and I would like to reserve two minutes for rebuttal, please. May it please the court, my name is Richard Wolfram. I am here for Evergreen, the plaintiff appellant today. Summary judgment in this case should be denied. Evergreen satisfies the Monsanto and Matsushita standards with undisputed material facts and disputed issues of material fact. The many threads of substantial evidence support Evergreen's claim that the converter defendants who occupy some 90% of the relevant market and the ACC engaged in a concerted refusal to deal with Evergreen. This was an agreement to limit the terms on which to deal for sustainable, cost-effective recycling of soiled food service polystyrene products, and it violated Section 1. Some new technologies and methods disrupt, in the best sense of the word, old industries. Evergreen might have done that, but for the market distortion by the defendants. Just last week, I overheard one electrician say to another, as they converted a traditional lighting system to LEDs, quote, green technology has really energized the electric lighting business, just like aluminum, batteries, and plastics. And that's the antitrust policy underlying our case. Whatever Green sought to introduce might have energized the polystyrene food service industry, which I'll abbreviate PSFS, it's a mouthful, but like Cisco, the largest distributor in the nation, and Sodexo, the largest food management group, consumers here, the large school districts nationwide, did not get to choose. Defendants decided for them, making sure that no one of the converters was going to act competitively to steal a march on any of the others by buying into sustainable recycling. Contrary to Judge Stern's statement below, this is not a question of Evergreen seeking to use antitrust to force an environmental solution on the market. The district court wrong-footed its summary judgment inquiry, and its misunderstanding of the law skewed its perspective on the facts. The judge asked counsel for Evergreen rhetorically, and I quote, what in the antitrust law makes it anticompetitive to choose one alternative, even if you do it collectively? Again, assuming that we're dealing now with a rule of reason analysis and not a horizontal conspiracy, I mean if we sat as a group of utility owners and debated the virtues of natural gas versus whale oil in the 19th century, and suddenly was offered direct current and gave up our effort to promote whale oil, which had been my first choice, what in the antitrust laws makes that anticompetitive? I'm not sure where that argument goes. Close quotes. I would suggest that everything in the antitrust law, to use Judge Stern's phrase, makes that anticompetitive. If it's a collective decision, and that's what the judge was positing, then it's a naked per se illegal refusal to deal, and so it is here. Even if it were to be judged under quick look or the rule of reason, we've satisfied our burden. We've shown anticompetitive effects. Is the pick-a-winner testimony critical to you being able to show that there was a collective refusal to deal? It's important but not essential. I think it's one manifestation. I thought that the pick-a-winner was ambiguous as to whether they were saying, we want to make sure that there's a viable company that can do this, not we want to pick, I forget the name of the other. PDR. PDR over Evergreen. Just assume I thought it's ambiguous on that. So under the Massachusetts standard, that testimony can't be the plus factor that gets you over the hump. How could you win assuming that? The rejection, that is one element, Your Honor, I understand. I think there could be different interpretations of it. I do think that it is direct evidence, but even if it were ambiguous, there was a continuing ongoing concerted refusal to deal, and I think another prominent piece of direct evidence is the very rejection by the group in May of 2007, announced, articulated to the group in June, the following month, of Evergreen's proposal for the LA Unified School District plant, which it was invited, it was solicited to bring to the PFPG after Evergreen itself had been working with Genpak, and Mr. Riley from Genpak, and others said to Evergreen, bring a proposal to the group, to us. That is a direct evidence of a concerted refusal to deal, because they then voted, and there is record evidence saying that they voted the individual members of the PFPG to reject his proposal. And why did they bring it? They have to go through PFPG in order to get to the? No, they did not. In fact, Evergreen. So what was the vote on? The vote was on what? The vote was on the proposal that Evergreen took to build a plant and have the LA Unified School District. Why were they voting on it? I mean, what was the operative outcome? So they vote on it, okay. They voted and they rejected it. And what's the consequence of rejecting it? The consequence is there was a collective refusal by the group, and whereas Evergreen? Why did the group have to pass on it in order for Evergreen to get what it wanted? I think that's a question best put to the group. It should not have. And if I were advising? No, no, no. Why did Evergreen think it needed? Because it was told specifically by Riley of Genpak and then by the steering committee of the PFPG. Bring a proposal to the PFPG. In other words, if you want to deal with any member? Yes. And they would have needed to deal with at least one member. He wanted to deal with at least one. He needed only one. And he's basically being told, if you want to deal with any of us, you've got to get the whole group to say yes. That's right, which I think is a manifestation of an overall posture of the defendants, which is we're all in or we're all out in dealing with you. And I think, and we have maintained throughout this case, that there was pressure on the smaller converters, that's Genpak and Dulco, to come to heel in response to the dominance of active and. And what's the district court's finding on that episode that you just recounted as to why that is not sufficient? I think that the district court, if I, you know, honestly I don't remember specifically, I know that one of the issues that has been raised is whether Evergreen solicited or was solicited. You know, there's the whole Tunica Web issue, which we believe falls very squarely in our favor, because in this case he did not come first to the group. He was asked to come to the group that is exactly on all fours with the second half of the Tunica decision, where, as you may recall, they said that if indeed it is found on remand, that the website designer in Tunica Web solicited individual casino operators to advertise on its website, then that would be, in fact, even a per se, if it were found to be so. And there would be no question of Tunica having solicited the group itself. Can you tell me if the assertion is that individual members of the group could not make independent decisions, that these were group decisions and the individuals who made up the group could not make independent decisions, what's the best evidence of that that you have to put forward? The best evidence of the fact that they could not make independent decisions, I think the very best is the group decision with respect to Los Angeles. So it's the fact that they presented this united front? They presented this united front. And then what – I'm sorry, Judge Barron, what the district court said in response – no, well, this was in response to actually to your question, the subsequent conduct by Genpak and Delco with Evergreen, in his view negating the notion that there was any conspiracy because they dealt with him, as to which we say, well, that is fully consistent with an agreement to limit the terms on which to deal, because they did not deal on recycling terms. They simply bought the resin. But the best evidence, Judge Howard, is the refusal, but I think this is sort of the proposal for L.A., but it's the poll star for a whole line of evidence going out and converging back into the central refusal to deal. We have the support of PDR, which was a non-functioning entity. There is at the very least a disputed issue of fact as to that. We discussed that in the reply in the opening brief. But the fact – and call it what you will, it was a non – essentially a non-functioning entity, and the PFPG supported it, pushed it out there to the major school districts in the East Coast and the West Coast, and that hurt Evergreen competitively. They were also putting in news stories about PDR. PDR's CEO testified in that position that we weren't doing anything. We were landfilling. There was, at best, very, very little. So another, I think, piece of evidence, and you could say it's circumstantial, is that the PFPG throughout was maintaining a campaign of so-called support of recycling, but they never supported sustainable recycling, which is what Evergreen represented. That was its model, and it was the only one doing it. They did this because they needed to resist the bans, which were a serious threat to their conventional way of doing business, which is to buy virgin resin, put it in the material, and then the stuff gets used for 15 minutes, and it gets sent off to landfilling. So they wanted to tell – make it seem to the public that they were interested in recycling. They did not want to bite the bullet on the inevitability of the need for some kind of recycling, some kind of alternative. And at the same time, they maintained very clearly in their papers, and we brought it out in our reply, that they did not buy into sustainable recycling. So I think there's an inconsistency, there's a contradiction there, which at a certain point, the center simply doesn't hold any longer, and what happens is that Evergreen, the only one who is proposing sustainable recycling, becomes roadkill in an opposition to sustainable recycling. And that goes back to 2005. There's documentary testimony on the record where Lammers, for example, the CEO of General Counsel, says in 2005 in meeting notes, do we think we can win out against our opponents without doing – Can I go back to that May meeting for a moment just so I understand what's happening? If Evergreen had wanted to go – there's not evidence that Evergreen – there's two different levels, there's the individual members and then there's the group. Yes. Okay. If I go to a group and say, I'd like all of you collectively to help me build a recycling plant, and the group says, no, all of us together would not like to do that, no antitrust problem. I agree. Okay. If I go to each individual member and say, I'd like each of you to help me do it, and each one says, no, I'd rather not do that, no antitrust problem. I agree. Okay. The only problem is if the group says to each member, we're not doing it together and we're not doing it separately. Correct? I would agree with that. Okay. So what's the evidence from that May 2007 meeting that not only did we have them going to the group and the group saying, jointly we're not going to do this, but that the group was saying, jointly we're not going to do this and not any one of us is allowed to do it? There was a vote, so we've established that. The vote is just we're not together going to do it. I understand. And so the argument is – so I guess, am I correct that your question is, how do we know that implied in that is coercion on any of the individuals, not subsequently to deal with Evergreen on its terms? Correct. That's the question. And I understand the pick-me-winner could be some evidence of that. If I thought that's ambiguous, I'm trying to find what is the evidence you're relying on to suggest the coercion by the group on the members? I would say that at the very least the evidence of the absence of any one of them dealing with Evergreen on sustainable terms is suggestive, at least as a plus factor. If not under Monsanto, reasonably can you show a conscious commitment to a common scheme, then at least excluding – or do we get with the plus factors to exclude the possibility of independent conduct? I think for summary judgment purposes, the fact that that Genpak – all we had is Genpak and Dolco working with Evergreen, $150,000, we'll buy your resin, that's it, we're not paying any commissions, no sustainable recycling, at least is consistent with that decision. There was no evidence that anyone wanted to do it. What we do know is that subsequently, back around like 2008, the group began to come around to Evergreen's model. At least there is no product out there that contains recycled PS resin now, but they at least were talking about that. But I do not – I don't have a smoking gun that says that – and no one of you will do it. But the circumstantial evidence I would submit is very strong that there was pressure from Pactiv and Dart on the smaller companies. It was, after all, Riley who worked for Gwinnett School District with Evergreen. He got outbid in what was a suspect sort of distinct difference in the bidding one year from the other where Pactiv came in and muscled its way in and said, we're going to underbid and there's no way we're going to allow sustainable – you know, any kind of recycling to go on. You're going to have to wrap up, Mr. Wilkman. So I think there's a lot of circumstantial evidence and the support of PDR, which was not engaged in anything, certainly not sustainable recycling, to make it seem as if they were engaged in that. I think that the circumstantial evidence constituting plus factors. There are other plus factors. You've reserved some time. I will reserve it. Thank you. Good morning. I'm John Faust. I'm here on behalf of Pactiv, ACC, Dart, and Solo. And then Mr. Calley will have some separate remarks on behalf of his client, Dalco. And to start with the colloquy that just took place a few minutes ago, there was nothing about that May 2007 meeting that determined or restricted or constrained anything that would happen with the individual company's consideration of Evergreen. And you know that for a number of different reasons. Perhaps most clearly that two months after that meeting, you have two of these defendants, Dalco and Genpact, agreeing to fund Evergreen, providing collectively $150,000 to Evergreen that saved the company or at least kept it from an earlier demise than it had. Each of those companies, Dalco and Genpact, got an exclusive, negotiated an exclusive to all the resin that Evergreen had for purposes of making trays and for making egg cartons. Genpact goes on and makes something like 23 million trays in part with Evergreen's resin that it sells to the Gwinnett schools. After this May 2000 meeting, all the other defendants interact with Evergreen. My client, Dart, never got a call from Evergreen. It called Evergreen to evaluate the resin both as to pricing as to quality. Pact had spent the better part of a year and a half or so testing the resin to see whether Evergreen's resin to see whether they could use it. My other client, Solo, spent a couple of years trying to negotiate price, doing some testing. All of this, and one of the things that you'd maybe expect to see in a conspiracy case where the allegation is, as you heard a minute ago, that the trade association is sort of controlling the individual company's reactions to a particular vendor, you'd expect some conversation about that. You don't have a conversation either between the defendants on their own, with any of the defendants, and the trade association, or even within each of the defendants individually, showing any animus toward Evergreen or any supposed market disruptive impact of what they were doing. There's just no evidence that anybody tried to do that when Gwinnett, for instance, went out and made trays for, Genpact went out and made trays for Gwinnett, that any of the other players, any of the other defendants, called them up and said, why did you do that? Nobody called Dalco or Genpact and said, why did you fund these guys? But if I understand it, the argument is there is a business model that Evergreen had, which depended on a subsidy, essentially, from the people they were going to deal with, which people in the industry would have potentially an interest in not paying. Yes. And they're totally entitled not to pay it. But they're not entitled to collectively decide, no one shall pay that subsidy. Right. Okay? So the fact that you dealt, people dealt with Evergreen not on that term, isn't probative of whether they were trying to make sure no market got created in which somebody could exact that subsidy, because once that gets going, then particularly what's going on in the political universe, you could see how there'd be a fear. This market is going to suddenly be dominated by a player that has a business model, that has that subsidy, and everyone's going to have to start paying that subsidy. So we're happy to have a recycler, we're happy to have, but what we don't want is somebody with this business model. That's what I understand the argument is. You could have a theory like that. There's just no facts for that. Okay. So then the facts for it would be, if I get it, no one would deal with them on that term, even though they'd deal with them on other terms. That's not itself dispositive. They talk about picking a winner, and to the extent that there's evidence a jury could conclude they must have meant the other company, what is it, Pro? PDR. PDR was who they're talking about because they promoted them heavily. That's an allegation, of course. PDR happens to be a competitor that doesn't charge the subsidy. Right. So they collectively reject funding Evergreen knowing that it has the subsidy. So I guess the point is, at what point do you have enough of those just on summary judgment to say, could a jury reason it? And that's my only problem with the district court opinion. It doesn't read like a summary judgment decision. It reads more like the best view is X. So I'm just wondering, how do you respond? Under Matsushita, why isn't there enough here to at least let a jury decide? I think what you've just articulated is the kind of analysis you would do under the plausibility heading at the pleading stage under Twombly. What you've articulated there, if proven, is all consistent with conspiracy. And my colleague said the same thing when he got up here. That is a consistent articulation of what could be a conspiracy. Something has to nudge that over the edge. And what I'm suggesting is, there's no mystery about why each of these individual defendants, acting individually, decided not to go with Evergreen. The record is there and it's undisputed. It was too expensive. Yes, they wanted to do recycling. Mainly looking to the future. You want to be a green company, you can. Also because it is an effective way, we thought, of resisting material bans. But not at any price. And when you look individually at each of these companies, and again the record is undisputed, they're not talking to one another about this. They're not expressing any fear of any market disruptive impact of EPG, of Evergreen. They're not suggesting that anything that happened in the trade association controls what they're doing now. What they're doing is evaluating. So just the same question that I asked the counsel on the other side. That argument is dependent on us concluding that the pick-me-a-winner phrase is ambiguous. If we thought pick-me-a-winner meant pick PDR, would that push it over the edge? If not, why not? Some people didn't pick PDR. I'm not sure anybody did, actually. My client worked with PDR and evaluated their resin and their pricing the same way they did Evergreen's. Worked with them for a while and then didn't. But I guess the idea would be if you're going to have a recycling entity, it's going to be PDR, not Evergreen. And the implication would be because it charges the subsidy. Why wouldn't that be enough to get it over the edge? Nobody said that. Nobody evaluated it that way. When they looked at Evergreen, what they saw was quality problems and a very expensive product from a lot of standpoints. Which is actually, Judge Torreo, when you looked at this back in the pleading stage, the assumption was that we've got a product here that's essentially a no-brainer. And if you're not going to do recycling this way, it must be because of a conspiracy because it's just a win-win for everybody around. It didn't turn out to be that way. Evergreen was not getting the environmental fees that it asked for from the schools, with maybe one exception. It could never produce resin at its own cost at less than about $2, way over what it could ever have charged. The commissions were higher than it said were standard in the industry. And then it was asking for all of these extras on top of it, some of which you can actually see in the various options that were put in front of the PFPG, for investment, hundreds of thousands of dollars. At the end of the day, there's no dispute that doing business with this company was more expensive than the way these companies were doing business in the past. And as long as they're looking at this, Judge Barron, individually, and deciding as prudent business people that this is too much money for a lousy product, and they don't want to do that business, and they think that in some instances that PDR is better, and there's record evidence of that too, and cheaper, they can do that as long as they're not agreeing with one another to do it. I don't think there's any controversy about that. Supporting recycling. Mr. Wolfram talks about sustainable recycling. The question is begged, sustainable for whom? Yes, of course, from the standpoint of the recycler, I would love to get more than market for my resin. I would love to get environmental fees from the schools. I would love to get commissions that these defendants are not going to be paid. And I'd love to get a whole bunch of subsidies so that I can run my operations without digging into my own pockets or going further into debt. But nobody is required to subsidize another business. And yet, individually, they looked at another entity and decided that I can be a recycler without all those strings attached. Then why wouldn't you do that? And that's not to say, all I'm saying on that is, that the whole inference that this was such a no-brainer, that not doing it means there's a conspiracy, has just got to be gone. And we have to look, and we can look, Judge Stearns did too, individually at each of these companies, without the interaction that you see, typically would see in a conspiracy case, with the trade association or with each other, but just evaluating this as a business deal on its own, deciding that it didn't make sense. And particularly in a situation where you start at the pleading stage, this court is told that this is an innovative product that's going to come to market and save consumers money. It's not going to save consumers money. It's not disputed that it's going to cost them more. In fact, there's evidence in the record that Evergreen approached Walmart and said, you know, if you're serious about sustainable recycling, you need to mark up these products 5 or 10 percent and pay me that premium so we can develop this market. And Walmart said, I beg your pardon. Recycled products should be cheaper. That's what our customers think. That, if you look at the evidence, and that's also undisputed, each of our companies concluded the same thing. There's no market out there, at least right now, of customers who are going to come forward, and because this product is so-called green, because it's got 5 percent of his resin in it, are going to pay a premium for it that's going to cover the commissions and the loans and the investment and the partnering fees and the licensing fees and the above-market resin pricings that this company wanted each of us to pay. That's really our view of the conspiracy case. There are other grounds that Judge Stearns didn't reach that are, I think, pretty well laid out in the brief, but I would say one maybe stands out more than the others. To me, for the clarity of it, how much it really goes against the First Circuit authority, and that is this rule of reason. It's clear under U.S. health care and the stop-and-shot case in this court that in a group boycott context, you don't get per se treatment unless what you're doing is targeting a competitor at the same level of the market. You have to have a case in which the group was trying, or some segment of the group was trying to harm another competitor at their level of the market by cutting off its access to resin supply, customers, or distribution. You don't have that here. It's not structured in the way that is typical for per se treatment in a group boycott setting. You reserve per se treatment for the things that are just clearly anti-competitive and don't have any possible pro-competitive justification that could be associated with them. That's not this case because this is a product that had lower quality. Did I just finish my sentence? Lower quality, higher price than products that are already on the market. So there clearly would be a pro-competitive basis even if there were a conspiracy here, and you'd have to at least get into rule of reason, market analysis-type evidence. They decided not to, all or nothing, gamble on per se treatment, and it's not appropriate. Thank you, Your Honors. Your Honors, may I please the court? My name is Stephen Cowley. I'm here on behalf of Technoplex, which is known in this case by the trading name, the business line of the group that makes the products that are relevant called Dolkel. On behalf of Dolkel, I have a few things to say. I want to be very clear. For all the reasons Attorney Faust just argued, Dolkel completely agrees with the defendants that summary judgment should be affirmed on the grounds that there is no evidence of any conspiracy. But, Judge Barron, I want to pick up from the point. If one were to assume that there's a question raised by pointing to a phrase, and if one were to say, well, then, if I'm going to let Evergreen try to prove the conspiracy it alleges, why shouldn't they go back? As to Dolkel is what I'm here to say. Even if you were to assume, as Evergreen wants us to, that the statement, pick a winner, meant they have the ability to go to trial and prove that what the PFPG members were really doing was agreeing among themselves to not do business with or to destroy Evergreen's ability to do business by picking a sham PDR, promoting that instead, drying up its customer base. The record evidence, the undisputed evidence, is Dolkel did not participate in that conspiracy. And why do I say that? The answers to the question as to what evidence, that the group was telling the individual members, you can't do it either. We're saying no to the group, and that means members, you can't work with them either. They point to two things. Throughout the briefs, there's a lot of different references, but there's two principal arguments. One is they point to the decision on the May 2007 proposals, which came out in June 2007, for the group to say no to Evergreen. We're not going to pay you all that money, help you build your California facility. We're going to go in a different direction. And then all the direction that they went into in terms of lobbying and promoting recycling, Evergreen characterizes as not really going to ever get to sustained recycling, so it must have been intended to drive us out of business. But what did DOLCO do? Immediately after that meeting, where the group said no, DOLCO reached out, and with Genpak, a defendant who is no longer here, did agree to fund Evergreen's Georgia, the only operating facility it had in Georgia, did agree to buy its resin. And the argument was just made that that agreement doesn't count because it wasn't for recycling. It's undisputed in the record that the resin DOLCO purchased over time, paying in advance the subsidy, $150,000 total was paid as a subsidy in advance before any resin was delivered. DOLCO had already given the equipment to get Georgia up and running, so DOLCO is subsidizing Evergreen's Georgia facility. It's taking that resin, and what was capable of being used, because the record's all so clear, much of it was of such terrible quality it couldn't be used at all, but to the extent it was being used, it wasn't being used to make products that weren't recycled. It just went into a line of products that DOLCO was already making with recycled content. Fifteen years before it ever heard of EPG, and for many years after, DOLCO's been producing and selling successfully recycled content egg cartons. That's exactly what they used the Evergreen resin for, and that was undisputed in the record. So it is recycled content products that have been always put out by DOLCO. I had a couple other points to make, but I'm out of time, so I won't. Thank you. Very quickly, taking the questions, the order from Mr. Faust in reverse order. As for the rule of reason, Superior Court trial lawyers' unambiguous Supreme Court rule, it was a bunch of trial lawyers who allegedly sought higher prices vis-a-vis a vertically situated buyer, that is the entity that was representing the indigents. They sought to raise their prices. The court ruled per se. Tunica Webb was a vertically situated, but as among the casino operators, horizontal, which is exactly on all fours with our situation, as I said before, if they found that there was the conspiracy, the Fifth Circuit said per se. So that is wrong. As for DOLCO and the investment, the fact remains that there was no buy-in to the sustainable method because there was no buy-in to the commissions which were necessary for the sustainable method as one of the three legs of the model. Why would you, if there was the conspiracy that you're causing, why would you have done the deal, though, with Evergreen? I mean, it certainly would have been better for the conspiracy not to do the deal and have Evergreen just go under quicker than to do a deal that kept them going partially because, I mean, money is fungible. If they get any money, it gets them closer to the goal that you supposedly say the whole conspiracy is designed to thwart. Mike Forrest is a dogged businessman and he was dogging them and he was already talking about being quite upset about their having engaged in group conduct and what we have said in our papers is that it is certainly plausible that they did this in order to buy peace with him. It was basically small fear and it was not buying into the sustainable method. He should have said no. Who should have said no? Forrest. Forrest? Who would have been better for his conspiracy claim? Well, he wasn't thinking, you know, perhaps as a lawyer. If I may just quickly respond to a couple of other points. That's wrong that there were no environmental fees that were being paid. Gwinnett did pay environmental fees. As far as no market, no appetite for this, the major distributors, food service groups, Cisco and Sodexo were all over Evergreen clamoring for this. As far as the quality is concerned, Gwinnett, a couple of figures, 100 million trays, $3 million revenue, 800,000 pounds of resin from 2003 to 2008. There are always going to be some issues about quality. If you want to use it as a product, trot it out there. It might work, but it doesn't stack up with the evidence. This is summary judgment. This is not trial. As far as PDR, that they quit working with PDR because PDR wasn't there and PDR's product was up to $8 versus Evergreen's. Great opportunities here according to Patterson and Riley beforehand. Why would they be saying great opportunities? All right, that's enough. Thank you. All right, thank you.